[Civ. No. 17414. Third Dist. Feb. 7, 1979.]

RESIDENTS AD HOC STADIUM COMMITTEE et al.,
Plaintiffs and Appellants, v.
BOARD OF TRUSTEES OF THE CALIFORNIA STATE
UNIVERSITY AND COLLEGES et al.,
Defendants and Respondents.

276

COUNSEL

Gallagher, Soley & Gollmer and Judith L. Soley for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, and Carol Hunter, Deputy Attorney General, for Defendants and Respondents.

OPINION

EVANS, J.—The plaintiffs, Residents Ad Hoc Stadium Committee, David Troehler, Don Gennuso, and Ruth Albright, appeal from a judgment which found that an environmental impact report (EIR) adequately supported the decision of defendants, Trustees of the California State University and Colleges (Trustees), which approved and authorized construction of an athletic stadium located in the northwest area of the campus of California State University at Fresno (CSUF). The proposed site at the southwest corner of the intersection of Barstow and Cedar Avenues in Fresno was acquired by the university in 1958 and 1959. At the time of acquisition, the area was surrounded largely by open agricultural land. At the time the EIR was prepared, the surrounding area was developed residentially with single family homes, apartments, sorority and fraternity houses, and the CSUF campus.

The California state college system plans its campus development pursuant to master plans adopted by the Trustees; since 1954, the master plan of CSUF has designated the proposed site as the location of an athletic stadium. The present master plan adopted in 1959 and last amended in 1975 also designated the precise location as a stadium site.

In March 1975, the Trustees decided to go forward with construction of the stadium, and on July 14, 1975, contracted with Environmental Impact Planning Corporation (Corporation) for preparation of a draft EIR. In preparation of the draft, the Corporation consulted with the City of Fresno and other public agencies, individuals, CSUF officials, and interested or adjoining property owners. Many of the consulted agencies and individuals submitted comments on the project which were considered by the Trustees prior to adoption of the final EIR.

The Trustees' committee on campus planning held two public meetings: one in February and one in May 1976, at which public participation was invited and had. At its May 1976 meeting, the Trustees approved the construction of the stadium at the proposed site and made their determination that the final EIR met the requirements of the California Environmental Quality Act of 1970 (CEQA). (Pub. Resources Code, §§ 21000-21176.)[1] On June 7, 1976, notice of that determination was filed with the secretary of the resources agency. That notice contained the information required by section 21161.

Plaintiffs thereafter filed suit seeking to invalidate the EIR as a post hoc rationalization of the project, to enjoin solicitation of building funds for the stadium, and to determine that the scope of judicial review (substantial evidence test), as provided in section 21168, is unconstitutional as it denied plaintiffs equal protection under the laws. From an adverse judgment plaintiffs present an appeal in which numerous fractionalized issues have been presented for our consideration. A distillation of the 20 issues and subissues presented reveals the following to be the crux of the appeal: (1) The provisions of sections 21168 and 21168.5, that the substantial evidence test applied to judicial review of administrative decisions on the adequacy of an EIR, violate the equal protection provision of the California Constitution. Plaintiffs hypothesize the review involves a fundamental vested right requiring use of the independent judgment test. (2) The failure of the Trustees to make specific findings on whether the necessity for the stadium outweighed adverse environmental consequences of the project invalidated their determination. (3) The EIR does not meet the requirements of CEQA and is at most a post hoc rationalization for the stadium construction; it does not adequately respond to comments made and fails to adequately discuss alternative or mitigation measures. (4) The EIR should be determined to be invalid as it does not discuss the environmental consequences of other elements of the

---

[1]Unless otherwise noted, all statutory references are to the Public Resources Code.

CSUF campus master plan (a field house and parking lot) even though those elements are not proposed for present construction. (5) The court erred by its failure to award plaintiffs attorney fees; plaintiffs assert they occupy the status conceptualized as "Private Attorney General."

I

Plaintiffs' contention that a fundamental right is involved where an administrative agency authorizes a public construction project after determining that an EIR is sufficient, appears to be predicated on a conclusive assertion as it is not supported by any judicial precedents.

Despite the legislatively expressed public policy considerations inherent in matters of environmental concern (Pub. Resources Code, §§ 21000, 21001), California courts have consistently held that no fundamental right is involved in *granting, as opposed to cancellation,* of a construction permit. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 510, fn. 1 [113 Cal.Rptr. 836, 522 P.2d 12]; *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74-75 [118 Cal.Rptr. 34, 529 P.2d 66]; *Gallegos* v. *State Bd. of Forestry* (1978) 76 Cal.App.3d 945, 950-951 [142 Cal.Rptr. 86]; *Simons* v. *City of Los Angeles* (1977) 72 Cal.App.3d 924, 929-930 [140 Cal.Rptr. 484]; *Sierra Club* v. *California Coastal Zone Conservation Com.* (1976) 58 Cal.App.3d 149, 156 [129 Cal.Rptr. 743]; *San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584, 592-593 [122 Cal.Rptr. 100]; *Plan for Arcadia, Inc.* v. *City Council of Arcadia* (1974) 42 Cal.App.3d 712, 725 [117 Cal.Rptr. 96]; *Friends of Lake Arrowhead* v. *Board of Supervisors* (1974) 38 Cal.App.3d 497, 518, fn. 18 [113 Cal.Rptr. 539].)

As a consequence of the clear, unequivocal, legislative statement contained in section 21168, the independent judgment test is not applicable to judicial review undertaken pursuant to sections 21168 and 21168.5.

Public Resources Code section 21168 states: "Any action or proceeding to attack, review, set aside, void or annul a determination, finding, or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, on the grounds of noncompliance with the provisions of this division shall be in accordance with the provisions of Section 1094.5 of the Code of Civil

Procedure. [¶] In any such action, *the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in the light of the whole record.*" (Italics added.)

Public Resources Code section 21168.7 states, "Sections 21168 and 21168.5 are declaratory of existing law with respect to the judicial review of determinations or decisions of public agencies made pursuant to this division." *Bixby* v. *Pierno* (1971) 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242], which held that the independent judgment test applies to judicial review of certain administrative decisions, was decided prior to the enactment of section 21168.5 and is not here applicable. The Legislature has stated that upon judicial review the substantial evidence test is to be utilized (§ 21168). Imposition of the independent judgment test upon judicial review may only be required by legislative amendment. This court is disinclined to intrude judicially into the legislative function under the guise of statutory interpretation. Furthermore, the fact that section 21168.5 was amended in 1976 without change in the directive that the substantial evidence test be used, reveals a legislative intention that the independent judgment test not be applied.[2]

The provisions in section 21168 that noncompliance shall be determined in accord with Code of Civil Procedure section 1094.5 does not impair the vigor of the directive in the section that, "In any such action, the court shall . . . only determine whether the act or decision is supported by substantial evidence in the light of the whole record." A similar intent is evidenced in section 21168.5, which provides, " . . . the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."

We conclude that judicial review limited to a determination of whether the Trustees' decision that the EIR met the minimum standards of CEQA is supported by substantial evidence does not constitute a violation of equal protection. The statutes contain a valid expression of legislative intent. (See *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396]; *Simons* v. *City of Los Angeles, supra,* 72 Cal.App.3d at p. 929.)

---

[2]We note that where a fundamental right is involved, such legislative specification is not conclusive; however, the case presented does not involve a fundamental vested right (see discussion, *ante*) and the independent judgment test is not applicable.

## II

Plaintiffs assert the Trustees' omission to make findings (§ 21081) that the necessity of the stadium project outweighed adverse environmental facts, renders its determination invalid.

Section 21081 was approved by the Legislature on September 28, 1976, and became operable January 1, 1977; the Trustees made their determination on May 26, 1976. ■ The Trustees' failure to make findings was consistent with then existing law.[3] (See *Fields* v. *Eu* (1976) 18 Cal.3d 322, 333 [134 Cal.Rptr. 367, 556 P.2d 729]; Cal. Const., art. IV, § 8, subd. (c).) As section 21081 does not by its terms provide for retroactive application, it may only be considered prospectively. (*Balen* v. *Peralta Junior College Dist.* (1974) 11 Cal.3d 821, 828 [114 Cal.Rptr. 589, 523 P.2d 629].)

Moreover, plaintiffs participated in the hearings and opposed both the EIR and the Trustees' approval of the stadium project, but did not urge that findings be made. Absent such a request we fail to discern any policy considerations which favor retroactive application of section 21081.

Plaintiffs further contend that because findings are required in certain actions brought pursuant to Code of Civil Procedure section 1094.5, findings are required herein. We disagree. The then applicable sections providing for judicial review of administrative approval of an EIR indicated a legislative intent that findings not be required.

Defendants also argue that the reasoning of the Supreme Court in *Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at pages 516-517, that, " . . . findings enable the reviewing court to trace and examine the agency's mode of analysis. [Citations.] [¶] Absent such roadsigns, a reviewing court would be forced into unguided and resource-consuming explorations; it would have to grope through the record to determine whether such combination of credible evidentiary items which supported some line of factual and legal conclusions supported the ultimate order or decision of the agency. Moreover, properly constituted findings enable the parties to the agency proceeding to determine whether and on what basis they should seek review. [Citations.] They also serve a public relations function by helping to

---

[3]We also note that the applicable administrative regulation, California Administrative Code, title 14, section 15088, filed October 8, 1976, Register 76, No. 41, made compliance with the regulation authorized but not required before January 1, 1977.

persuade the parties that administrative decision-making is careful, reasoned, and equitable" (fns. omitted) required the Trustees to prepare and file findings of fact. We reject the argument.

Plaintiffs present a prolix attack on the sufficiency of the EIR, and cite only those portions of the evidence favorable to their contentions rather than making a presentation of all evidence which might have a bearing on the trial court's decision; as a result this court has been forced to explore in detail the voluminous record presented in order to achieve a comprehensive review of the case. Accordingly, the considerations enunciated in *Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d 506, are inapplicable.

In the other cases relied upon by plaintiffs in which a requirement of findings was imposed, the records did not demonstrate that the administrative agency had considered the relevant issues. In *Topanga,* the court noted that the required evidence for showing that a variance could be granted was not present as no details concerning the surrounding properties were given. (11 Cal.3d at p. 520.) Similarly, in *City of Carmel-by-the-Sea* v. *Board of Supervisors* (1977) 71 Cal.App.3d 84, 96 [139 Cal.Rptr. 214], which is relied upon extensively by plaintiffs, the court noted that the administrative official abdicated his responsibility for resolving the issue. Such was not the case in this proceeding. The resolution of the Trustees incorporated by reference the EIR and states, ". . . the Board accepts the Environmental Impact Report . . . as adequate and directs the report to be considered and any further actions on the stadium project, . . ." Moreover, the proceedings before the Trustees reveal more than ample consideration of all environmental consequences of going forward with the project.

Plaintiffs' assertion that in the absence of findings, there was no discernible balancing of the environmental consequences of the project against its benefits, considered in the light of the lengthy proceedings held both by the Trustees and the Fresno State University administrators, is best characterized as a palpable distortion of the record. To invalidate the Trustees' approval on this basis would constitute a gross act of judicial legerdemain.

The contention that the failure to make findings requires invalidation of the Trustees' approval of the project is baseless and without merit.

III

■ Plaintiffs contend that the EIR is inadequate, and at most, constitutes a post hoc rationalization of the project, and that the discussion of the alternatives in the EIR is insufficient.

Plaintiffs' multi-pronged attack on the sufficiency of the EIR misconstrues the function of the CEQA. "The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations." (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017].)

"[A] 'major purpose of an EIR is to inform other government agencies, and the public generally, of the environmental impact of a proposed project [citations] . . . .' (*No Oil, Inc.* v. *City of Los Angeles* [1974] 13 Cal.3d 68, 86) and to inform the decision-making agency of the full range of adverse environmental effects and alternative measures prior to its decision to approve or disapprove such project (former § 21061; Guidelines, §§ 15012, 15150), the underlying policy of the act to '[e]nsure that the long-term protection of the environment shall be the guiding criterion in public decision' (§ 21001, subd. (d)), dictates that the 'initial and primary responsibility for striking [the necessary] balance between competing concerns must rest with the [decision-making] agency itself, . . .' [citations] and whose consideration cannot be merely a 'post hoc rationalization' of a decision already made. [Citations.]" (*Mount Sutro Defense Committee* v. *Regents of University of California* (1978) 77 Cal.App.3d 20, 36-37 [143 Cal.Rptr. 365].)

Whenever a CEQA based challenge is presented against a project planned and approved prior to the act's effective date, the agency involved is vulnerable to charges of institutional bias, particularly so if its ultimate decision is in favor of proceeding with a project previously conceived or planned. Obviously, if the environmental evaluation occurs before the agency is committed to or plans a project, bias may be less likely and not as easily asserted. We cannot apply CEQA retroactively and as a consequence, reflexively condemn the effort to comply with the act's commands. The possibility that an agency which has published its prior approval of a project will continue to favor it despite the Environmental Quality Act cannot be a bar to compliance.

CEQA assumes as inevitable an institutional bias within an agency proposing a project and provides the procedural requirements (§§ 21000 and 21100) to insure that the decision-maker does not fail to note the facts and understand the serious arguments advanced by the opponents to the EIR.

" '[I]t is doubtful that any agency, however objective, however sincere, however well-staffed, and however well-financed, could come up with a perfect environmental impact statement in connection with any major project. Further studies, evaluations and analyses by experts are almost certain to reveal inadequacies or deficiencies. But even such deficiencies and inadequacies, discovered after the fact, can be brought to the attention of the decision-makers, . . . ' " (*Environmental Defense Fund* v. *Corps of Eng., U.S. Army* (8th Cir. 1972) 470 F.2d 289, 297; *City of Boston* v. *Volpe* (1st Cir. 1972) 464 F.2d 254, 257; *Environmental Def. F., Inc.* v. *Corps of Eng. of U.S. Army* (5th Cir. 1974) 492 F.2d 1123, 1129.)

The president of the Corporation testified he did not feel limited by CSUF in preparing the EIR; an independent examination of the EIR reveals it to be sufficiently informative to permit objective, reasoned analysis by the Trustees. It does not constitute a post hoc rationalization of the project.

The statement in *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.* (1972) 27 Cal.App.3d 695, 706 [104 Cal.Rptr. 197], that "It should be understood that whatever is required to be considered in an EIR must be in that formal report; what any official might have known from other writings or oral presentations cannot supply what is lacking in the report. (See *Greene County Planning Board* v. *Federal Power Com'n* [2d Cir. 1972] 455 F.2d 412, 420, 421)" is a correct statement of the law but is not applicable to this proceeding. In *Environmental Defense Fund, Inc.* and *Greene County Planning Board*, the decision-makers certified the EIR as adequate and decided to proceed with the project without conducting a public hearing at which objections to the EIR and the project could be presented and considered. Here, the Trustees were totally solicitous of public opinion and delayed their decision until a hearing was held at which all interested persons could voice their reaction to the EIR. Moreover, the second hearing was held *after* interested persons had been given the opportunity to state their objections and point out what they perceived as deficiencies in the EIR. (Feb. 1976 hearing before the Trustees.) The comments were incorporated in the

EIR, and the Trustees did, in fact, take a "hard look" at all presented environmental consequences of the proposed stadium.

■ Plaintiffs' additional argument that the comments should not have been considered by the trial court is at best sophistical as the requirement that comments be included in the final environmental impact report would be rendered sterile were we to concur in that contention (see Cal. Admin. Code, tit. 14, § 15146, subd. (2)); furthermore, comments have been determined to be an integral part of the EIR and should be relied upon by the decision-makers (see *Society for California Archaeology* v. *County of Butte* (1977) 65 Cal.App.3d 832, 839-840 [135 Cal.Rptr. 679]; *City of Des Plaines* v. *Metropolitan Sanitary Dist.* (7th Cir. 1977) 552 F.2d 736, 739-740; *Conservation Council of North Carolina* v. *Froehlke* (M.D.N.C. 1972) 340 F.Supp. 222, 226; *Environmental D. Fund, Inc.* v. *Corps of Eng. of U. S. Army* (E.D.Ark. 1972) 342 F.Supp. 1211, 1218). The comments were properly included in the report and considered by the Trustees. Plaintiffs' multi-faceted attack on the adequacy of the final EIR fails to find support in the record.

IV

The record reveals substantial evidence to support the determination of the Trustees that the EIR was adequate and that all reasonable alternatives were considered prior to the approval of the project.

"An EIR must describe all reasonable alternatives to the project. (§ 21061; Guidelines, Cal.Admin.Code, tit. 14, § 15143, subd. (d).) [¶] . . . including those capable of reducing or eliminating environmental effects; the specific alternative of 'no project' must also be evaluated. (§§ 21002, 21100; Guidelines, Cal.Admin.Code, tit. 14, § 15143, subd. (d).)" (*County of Inyo* v. *City of Los Angeles, supra,* 71 Cal.App.3d at pp. 200, 203.)

The discussion of alternatives need not be exhaustive, and the requirement as to the discussion of alternatives is subject to a construction of reasonableness. The statute does not demand what is not realistically possible given the limitation of time, energy, and funds. "Crystal ball" inquiry is not required. However, it is not appropriate to disregard alternatives simply because the alternative may be beyond the scope of expertise of the agency or because the alternative may require implementing legislation since CEQA was intended to provide a basis for

consideration and choice by all branches of government. ■ An agency need not devote itself to an extended discussion of the environmental impact of alternatives remote from reality such as those which are of speculative feasibility or could only be implemented after significant changes in governmental policy or legislation. (*San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584, 594 [122 Cal.Rptr. 100];[4] *Natural Resources Defense Council, Inc.* v. *Morton* (D.C. Cir. 1972) 458 F.2d 827, 834-838; *Natural Resources Defense Council* v. *Callaway* (2d Cir. 1975) 524 F.2d 79, 93.)

Absolute perfection is not required; what is required is the production of information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned. It is only required that the officials and agencies make an objective, good-faith effort to comply. That requires a "hard look" at environmental consequences in recognition of the factors described in sections 21000 and 21001; the court does not seek to impose unreasonable extremes or to interject itself within the area of discretion as to the choice of the action to be taken. (*Mount Sutro Defense Committee* v. *Regents of University of California, supra,* 77 Cal.App.3d at p. 37; *San Francisco Ecology Center* v. *City and County of San Francisco, supra,* 48 Cal.App.3d at p. 594; *Natural Resources Defense Council, Inc.* v. *Morton, supra,* 458 F.2d at pp. 834-838; *Natural Resources Defense Council* v. *Callaway, supra,* 524 F.2d at p. 93.)

When the alternatives have been set forth in this manner, an EIR does not become vulnerable because it fails to consider in detail each and

[4]As stated in section 21002.1: "(a) The purpose of an environmental impact report is to identify the significant effects of a project on the environment, to identify alternatives to the project, and to indicate the manner in which such significant effects can be mitigated or avoided. [¶] (b) Each public agency shall mitigate or avoid the significant effects on the environment of projects it approves or carries out whenever it is feasible to do so. [¶] (c) In the event that economic, social, or other conditions make it infeasible to mitigate one or more significant effects of a project on the environment, such project may nonetheless be approved or carried out at the discretion of a public agency, provided that the project is otherwise permissible under applicable laws or regulations. . . ."

" 'Environmental impact report' means a detailed statement setting forth the matters specified in Sections 21100 and 21100.1; provided that information or data which is relevant to such a statement and is a matter of public record or is generally available to the public need not be repeated in its entirety in such statement, but may be specifically cited as the source for conclusions stated therein; and provided further that such information or data shall be briefly described, that its relationship to the environmental impact report shall be indicated, . . ." (§ 21061.)

" 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1.)

every conceivable variation of the alternatives stated. (*Brooks* v. *Coleman* (9th Cir. 1975) 518 F.2d 17, 19; *Monroe County Conservation Council* v. *Adams* (2d Cir. 1977) 566 F.2d 419, 425.)

There were four alternative possibilities relating to the stadium project presented. First, the university could participate with the city in a jointly funded project. Second, CSUF could renovate Ratcliffe Stadium. Third, the stadium could be located on the eastern side of the campus. Fourth, the stadium could be located where CSUF has it proposed, on the west side of the campus. We find each alternative to have been adequately discussed in the EIR.

The jointly funded concept was rejected for valid reasons. At the request of CSUF, the Legislative Counsel submitted an opinion that the funds received from the sale of Ratcliffe Stadium could not be used for any purpose other than acquisition of an athletic stadium for CSUF. (See *Silver* v. *Brown* (1966) 63 Cal.2d 841, 846 [46 Cal.Rptr. 308, 405 P.2d 571]; see Ed. Code, § 90420.) Moreover, city officials had informed CSUF administrators that the city was not interested in participating in a jointly funded stadium project. The Trustees' conclusion against a joint project was reasonable and supported by substantial evidence.

The discussion of continued use of Ratcliffe Stadium is clearly a no-project alternative as the status quo would be continued.

The EIR abundantly details the reasons supporting the preference for an on-campus site and states that the needs of the physical education department, the accommodation of large gatherings from varied uses, easy accessibility of the stadium from on-campus housing, sufficient parking, and a full campus plan that would attract new students and supporters to the university could be achieved through an on-campus stadium.

Continued use of Ratcliffe was found to be undesirable because of outmoded facilities, lack of access and parking, and its limited capacity. The report also notes that continued use would hinder and delay expansion of the CSUF athletic programs.

Whether it is wise to commit CSUF funds and energy to a multi-million dollar facility is best left to the discretion of the persons responsible for academic affairs and not to the courts.

Plaintiffs' assertion that relocation of the stadium site to the eastern side of the campus would not have adverse environmental consequences and would not be opposed by east area residents is not founded on rational analysis of factual data. The record does not disclose any survey of the east area residents to ascertain their desires. The argument is considered to be advocate rhetoric and was properly rejected.

The eastern site as an alternative would merely substitute one group of objecting residents for another.

The east side location was more than adequately discussed in the report, and its rejection by the Trustees may not be classified as an abuse of discretion; the decision was supported by sufficient and substantial evidence.

Contrary to plaintiffs' urging, the discussion and consideration of the west side location and its environmental consequences was adequate. One of those consequences was air pollution in the form of smog, which is due in part to photochemical reaction of the oxidized products resulting from gasoline combustion. As stated in the EIR, since most utilization of the stadium would be at night, the effect of emissions discharged into the atmosphere is dependent on nighttime weather conditions; the EIR stated that a modeling computation to determine the effects of the pollution was made; it constituted a good-faith attempt to provide precise scientific measurements. The EIR thoroughly discusses and accurately reflects that the stadium project will have a significant impact on local air quality and on regional air quality through a delay in the attainment of clean air standards, and presents substantial discussion of potential mitigating measures. Moreover, one of plaintiffs' witnesses acknowledged that he could not specify any air pollution mitigation measures that were not discussed in the EIR.

The principle thrust of the draft EIR and comments concerning its west side location is directed toward traffic access and parking and was prepared by a traffic engineering firm. We are therefore unpersuaded by plaintiffs' allegations that the discussion is insufficient.

■ Plaintiffs' criticisms of the discussion of the noise impact of the project are similarly not well founded. The information presented in the EIR was based on measurements conducted at a similarly designed stadium in San Jose. The fact that noise contour diagrams were not made

or that computations were not included does not render the report deficient. The EIR notes that the most significant impact of the stadium will be on traffic noise and states that this noise is sufficient to disturb conversations and awaken residents. Mathematical computations can adequately predict probable sound levels and the projected probable noise levels contained in the report were obviously based on such computations. Plaintiffs' claim that the measurements taken from another similar stadium are invalid because intervening structures may have existed at San Jose, when examined is revealed to be no more than an expression of dissatisfaction with the result rather than a valid assertion made on a substantial basis.

Plaintiffs' remaining criticisms of the report as to waste water, construction dust, increased water use, land depreciation, and crime possibilities may be dealt with as hypercritical, hypertechnical hyperbole. As to waste water, the EIR indicates that the city has envisaged no difficulty in handling either runoff or sewage. (See *Silva* v. *Lynn* (1st Cir. 1973) 482 F.2d 1282, 1285; *Maryland-National Cap. Pk. & Pl. Com'n* v. *U. S. Postal Serv.* (D.C. Cir. 1973) 487 F.2d 1029, 1034.) Construction dust is a short-term problem which the EIR discusses as being minimized through the use of moisture at the construction site and the use of barriers. Plaintiffs' argument on water use, based on the facts that the figures in the EIR were erroneously labeled yearly instead of monthly is without substance. The water computations have not been shown to be incorrect.

Land depreciation was the subject of conflicting opinions; however, the report adequately dealt with the problem and the problem of possible relocation of nearby property owners. The report concluded, and it is not controverted, that the effects on value due to the project would be impossible to predict.

The EIR presents decision-makers with the important environmental consequences likely to result from the stadium, and sufficiently presents an adequate discussion of mitigation measures relative to those consequences.

V

We reject plaintiffs' contention that the EIR is defective for failing to consider the environmental consequences of the field house which the

master plan places south of the stadium site, the parking lot which the master plan shows at the northeast corner of Barstow and Cedar, as well as the entire remaining CSUF master plan.

The question of when in the consideration of capital improvements must an EIR be prepared, has been thoroughly discussed and judicially determined contrary to plaintiffs' argument. In *Mount Sutro Defense Committee* v. *Regents of University of California, supra,* 77 Cal.App.3d at pages 37-38, it is stated, "That the timing of the EIR is in the first instance committed to the discretion and judgment of the agency finds further support in two recent holdings of our federal Supreme Court: In *Kleppe* v. *Sierra Club, supra,* 427 U.S. 390 [49 L.Ed.2d 576, 96 S.Ct. 2718], the court likewise confronted the issue of timing (of the NEPA environmental statement) and the propriety of agency determination. In striking the S.I.P.I. formulated 'balancing test' (see fn. 18, *ante*) it was held (at p. 406 [49 L.Ed.2d at p. 588]): 'A court has no authority to . . . determine a point during the germination process of a potential proposal at which an impact statement *should be prepared.* Such an assertion of judicial authority would leave the agencies uncertain as to their procedural duties . . . [and] would invite judicial involvement in the day-to-day decision-making process of the agencies, . . .' " (Italics in original.)

Here there is little doubt that the critical time will be reached when final project development plans are submitted for recommendation and budgetary consideration by the Trustees. With respect to the stadium project, the Trustees have complied fully with CEQA requirements in considering its construction; we may assume they will act accordingly when they contemplate construction of other elements contained in the university master plan. ▪ An EIR is not required for a master plan or any element thereof not proposed for development.

CEQA is a technology assessment statute whose purpose is to require consideration of environmental factors before project momentum is irresistible, and all options closed. It is not an act dealing with abstract or theoretical plans, but rather its intent is aimed at any agency intending to carry out a project. In summary, our review was conducted to ascertain the sufficiency of the evidence to support the Trustees' decision on the adequacy of the report, not on the correctness of their decision to proceed with the project; and we find the EIR discussion meets statutory and judicial requirements.

## VI

Plaintiffs' final contention that it should be entitled to recover attorney fees, regardless of the outcome of the legal proceeding, is patently without merit.

The statutory right to attorney fees is limited to the successful litigant. Code of Civil Procedure section 1021.5 provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor." As plaintiffs were not the successful parties, they are not entitled to recover attorney fees pursuant to this section.

The provision for the recovery of attorney fees by the prevailing party is not susceptible to a constitutional attack on equal protection grounds. (*Great Lakes Properties, Inc.* v. *City of El Segundo* (1977) 19 Cal.3d 152, 156 [137 Cal.Rptr. 154, 561 P.2d 244] [see dissent of Justice Tobriner which also acknowledges that provision for recovery by prevailing party only does not raise a constitutional issue, *id.,* at p. 163]; *Sacramento M.U. Dist.* v. *P.G. & E. Co.* (1942) 20 Cal.2d 684, 694-696 [128 P.2d 529].)

Plaintiffs, however, also argue that the right to recover attorney fees is not based exclusively on statute; the allowance of fees is within the inherent equitable power of the courts.

A review of the theories used to rationalize an award of attorney fees in situations where they are not specifically authorized by statute or by contract reveals that a necessary precondition for such an award is either the rendition of a judgment in favor of the party seeking fees or the conferral, through the litigation, of substantial benefits on an opposing party. (See generally, Nussbaum, *"Attorney's Fees in Public Interest Litigation"* (1973) 48 N.Y.U. L.Rev. 301, 311-337; King & Plater, *The Right to Counsel Fees in Public Interest Environmental Litigation* (1973) 41 Tenn.L.Rev. 27, 77; Comments, *Who is to Guard the Guardians: Awarding Attorneys' Fees Against a State Defendant in Public Interest Litigation* (1975) 9 U.S.F. L.Rev. 465, 466-475.)

As stated by this court in *County of Inyo* v. *City of Los Angeles* (1978) 78 Cal.App.3d 82, 86 [144 Cal.Rptr. 71], under the "common fund" principle, " ' "when a number of persons are entitled in common to a specific fund, and an action brought by . . . plaintiffs for the benefit of all *results in the creation or preservation of that fund,* such . . . plaintiffs may be awarded attorney's fees out of the fund. . . ." ' " (Italics added.) The court also discussed the "attorney general" theory for an award of attorney fees: " 'This concept, as we understand it, seeks to encourage suits effectuating a strong congressional or national policy by awarding substantial attorney's fees, regardless of defendants' conduct, *to those who successfully bring such suits and thereby bring about benefits to a broad class of citizens.'* " (Italics added.) (*Id.,* at p. 87.) The "vexatious litigant" theory presupposes that the party seeking to recover fees has prevailed. This theory involves " ' . . . awards against an opponent who has maintained an unfounded action or defense " 'in bad faith, vexatiously, wantonly or for oppressive reasons.' " ' " (*Id.,* at pp. 86-87.)

Another theory to justify an award of attorney fees is based on the so-called "substantial benefit" rule: when litigation " ' " . . . *results in the conferral of substantial benefits,* whether of a pecuniary or nonpecuniary nature, upon . . . [the opposing party, that party] may, in the exercise of the court's equitable discretion, be required to yield some of those benefits in the form of an award of attorney's fees." ' " (Italics added.) (*Id.,* at p. 86.)

Plaintiffs have totally failed to bring themselves within the purview of any of these theories and cite *Sierra Club* v. *Lynn* (W.D.Tex. 1973) 364 F.Supp. 834 for the proposition that even if a party does not prevail, attorney fees may be awarded. However, plaintiffs' neglect to mention that on appeal, the district court decision was reversed, borders upon an attempt to mislead this court. (Bus. & Prof. Code, § 6068; see *Sierra Club* v. *Lynn* (5th Cir. 1974) 502 F.2d 43, 66.)

Plaintiffs' request for an order directing the trial court to permit the filing of a cost bill is denied.

The judgment is affirmed.

Puglia, P. J., and Reynoso, J., concurred.

On February 20, 1979, the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied April 9, 1979.